JOSEPH WILLIAM ZACAROLO,      )
                             )
              Petitioner,     )
                             )
         v.                  )        1:09CV5
                             )        1:06CR36-1
UNITED STATES OF AMERICA,     )
                             )
              Respondent.     )

## MEMORANDUM OPINION, ORDER, AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

Petitioner Joseph William Zacarolo, a federal prisoner, has filed a motion to dismiss for lack of jurisdiction (docket no. 118)[1], as well as a motion to vacate, set aside, or correct sentence pursuant to 28 U.S.C. § 2255 (docket no. 119).  These motions have been consolidated and referred to the undersigned for review and recommendation.  (Docket No. 135.)

Petitioner was originally charged with one count of damaging and destroying by means of fire and explosive a building used in interstate and foreign commerce in violation of 18 U.S.C. § 844, one count of carrying and using by discharging firearms during a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(iii), one count of carrying and using destructive devices during a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A)(i) and (c)(1)(B)(ii), and one count of possession of firearms which had not been registered in the National Firearms Registration and Transfer Record in violation of 26 U.S.C. §§ 5861(d) and 5871.

---

[1]This and all further cites to the record are to the criminal case.

(Docket No. 1.) He later pled guilty to the damaging and destroying a building charge, the discharging a firearm charge, and the possession of unregistered weapons charge. The carrying and using a destructive device charge was dismissed. (Docket Nos. 53, 54.) Petitioner was sentenced to 148 months of imprisonment on the first charge, a consecutive 120 months of imprisonment on the second charge, and a concurrent 120 months of imprisonment on the third charge. (Docket No. 86.)

Petitioner did pursue a direct appeal, but the Fourth Circuit upheld his convictions and sentences. (Docket Nos. 101, 105.) Petitioner then filed his current motion to dismiss and his motion to vacate sentence. Respondent has filed a responses to those consolidated motions. (Docket Nos. 125, 130.) Petitioner has filed what is essentially a consolidated reply, (docket no. 132), as well as a motion to amend that reply by adding an affidavit from one of his co-defendants in the case (docket no. 136). The motion to amend will be granted. Petitioner's other motions are ready for decisions on their merits.

<u>**FACTS**</u>

The basic facts of the case, as set out in the Presentence Report (PSR) and the factual basis supporting Petitioner's guilty plea, are as follows. On March 4, 2005, a man named Tracey Castle went to the home of Cammie Meadows to pick up Meadows' son. Castle and his wife were to babysit the son. At some point during the stop, Meadows and Castle had intimate relations of some type. A few days later, Meadows told Petitioner, who was her boyfriend,

-2-

that Castle had raped her. She never reported the rape to law enforcement.

On March 12, 2005, Petitioner and others met at a house in Rowan County, North Carolina, where they consumed drugs and alcohol. They also discussed the rape and decided to avenge that alleged crime. They gathered two .22 caliber handguns and made six "Molotov cocktails" before driving to Castle's residence in the early hours of March 13, 2005. The residence was a single-family dwelling that Castle and his family rented from Clyde Huntsman. Castle was not alone in his residence when Petitioner and his associates arrived. Inside with him were his wife and three children, ages 12, 11, and 8, and relatives visiting from out-of-town, Louis and Lora Bowers and their two children, ages 3 and 4. All of the occupants of Castle's residence were in bed asleep.

Upon arriving at the residence, Petitioner, a juvenile, and co-defendants Joshua Bare, Jeffrey Alexander, and Joshua Mann exited the vehicles in which they had been riding and stood in front of Castle's home. Petitioner, the juvenile, Alexander, and Mann then lit and threw the six "Molotov cocktails" at the house. Shortly thereafter, the juvenile and Bare began shooting into the residence using the handguns. The Bowers' family suffered the brunt of the attack. The two "Molotov cocktails" that actually entered the residence went through the window of their bedroom, setting their bed on fire. Their car had another of the incendiary devices thrown through the driver's side window. Most of the bullets that were fired also entered the residence in the area of

-3-

their bedroom, with one bullet striking Ms. Bowers in her left shoulder/back. It was initially left inside her shoulder, but later had to be removed after the wound became infected. Fortunately, this was the worst injury suffered by anyone in the Castles' home that night.

<u>**PETITIONER'S CLAIMS**</u>

Petitioner raises four potential claims for relief, all based on allegations of ineffective assistance of counsel, as well as his argument that jurisdiction is not present in the case. Petitioner's first claim for relief is that he received ineffective assistance of counsel because his attorney did not advise Petitioner, prior to the time that the plea agreement was signed, that a cross reference for attempted murder would apply at sentencing under the United States Sentencing Guidelines (USSG). His second argument is that counsel failed to arrange a conditional plea on Petitioner's behalf which would have allowed Petitioner to preserve and appeal the jurisdictional argument that he now raises in his motion to dismiss. Third, Petitioner claims that counsel did not file proper objections to several sentencing enhancements. Finally, Petitioner faults former counsel for failing to properly object to the application of the attempted murder cross reference mentioned earlier.

<u>**DISCUSSION**</u>

In order to prove ineffective assistance of counsel, a petitioner must establish, first, that his attorney's performance fell below a reasonable standard for defense attorneys and, second,

-4-

that he was prejudiced by this performance. <u>See</u> <u>Strickland v.</u> <u>Washington</u>, 466 U.S. 668 (1984). Petitioner is not entitled to a hearing based upon unsupported, conclusory allegations. <u>See</u> <u>Nickerson v. Lee</u>, 971 F.2d 1125, 1136 (4th Cir. 1992) (in order to obtain an evidentiary hearing a habeas petitioner must come forward with some evidence that the claim might have merit), <u>abrog'n on</u> <u>other grounds recog'd</u>, <u>Yeatts v. Angelone</u>, 166 F.3d 255 (4th Cir. 1999). A petitioner bears the burden of affirmatively showing deficient performance. <u>See</u> <u>Spencer v. Murray</u>, 18 F.3d 229, 233 (4th Cir. 1994). To show prejudice following a guilty plea, a petitioner must establish that there is a reasonable probability that but for counsel's allegedly deficient conduct, he would not have pled guilty but would have gone to trial. <u>Hill v. Lockhart</u>, 474 U.S. 52 (1985).

### Claim One

Petitioner's first claim is that his attorney failed to warn him prior to his pleading guilty that an attempted murder cross reference would apply at sentencing and result in an increase in his sentencing range under the USSG. Petitioner states that the attorney should have known that the cross reference would apply because it had already been applied to his co-defendants. He contends that he would not have pled guilty, but would have gone to trial if he had been aware that the cross reference would apply.

Counsel has filed an affidavit in response to Petitioner's allegations. In that affidavit, he does not directly dispute Petitioner's assertion that he did not advise him of the

-5-

application of the attempted murder cross reference. Instead, he explains the context and content of his discussions with Petitioner prior to the guilty plea. Counsel first acknowledges that he knew that the cross reference would apply to Petitioner. However, in discussing matters with Petitioner, he focused less on a sentence under the USSG and more on the minimum statutory sentences carried by Petitioner's charges. He explained that the charges to which Petitioner would be required to plead guilty under the plea agreement would likely result in a sentence of less than 30 years, but that the charge that was being dropped under the plea agreement carried a mandatory minimum consecutive sentence of 30 years just by itself. Pleading guilty meant a sentence of less than 30 years, while a loss at trial would mean a minimum sentence of 45 years, with the possibility of more. Counsel also warned Petitioner that his codefendants had already pled guilty and would testify at any trial. Counsel felt that Petitioner was almost certain to be convicted at trial. Therefore, he did advise Petitioner to take the plea agreement. (Docket No. 130, Ex. A ¶ 1 and Attachs.)

All of the advice just recounted was set out in a letter to Petitioner dated August 28, 2006. (Id. Attachs.) Petitioner initially rejected that advice, apparently hoping to proceed to trial with an insanity defense and raising other possible issues for trial. Counsel responded with a second letter dated September 6, 2006 which again explained the 45-year minimum sentence that Petitioner would face if he proceeded to trial and lost, the 30-year or less sentence that he would receive if he pled guilty,

-6-

and the reasons why he would be unlikely to win at trial. He also advised Petitioner that he would not have any basis to raise an insanity defense at trial. Petitioner responded to the second letter with his own letter dated September 11, 2006. In that letter, he agreed to accept the plea bargain in order to avoid the 45-year sentence. Petitioner does ask where he will fall under the USSG if he pleads guilty. (Id.)

It is not clear from the record what answer, if any, counsel gave to Petitioner's Guidelines question. However, on September 20, 2006, Petitioner appeared and plead guilty. He was advised in the course of his plea hearing that the statutory penalties were five to twenty years of imprisonment for Count One, at least ten consecutive years for Count Two, and up to ten years for Count Four. This meant Petitioner faced a minimum sentence of 180 months. Also, Petitioner was specifically warned that his eventual sentence within those limits would be calculated under the USSG, that the resulting calculation would be advisory, that the calculation could not be performed until after the PSR was prepared, and that the eventual sentence could be different from any estimate that his attorney had given. (Docket No. 91 at 5-9.) These same potential sentences were set out in the plea agreement. (Docket No. 53 ¶ 2.) Still, Petitioner continued with his guilty plea.

In the end, whatever counsel's advice or lack of advice concerning the application of the attempted murder cross reference and Petitioner's likely sentence under the Guidelines, it is clear

-7-

that Petitioner pled guilty knowing that he could potentially
receive not only the 248-month sentence he eventually did receive,
but even a much longer sentence. It is also clear that the real
impetus for his entering the guilty plea was avoiding the 45-year
minimum sentence he would have faced if he went to trial and lost.
He was successful in this and received only 68 months more than the
minimum sentence of 180 months that he faced based on his plea.

Petitioner has not explained why knowing more about the cross
reference would have changed his decision to plead guilty. The
application of the cross reference did not impact the significant
statutory penalties he willingly accepted at his plea hearing.
Also, whether or not the cross reference applied, Petitioner's
attorney had advised him that he did not have viable defenses at
trial. He has not shown that the advice regarding trial was
incorrect or that he had any possible defense.[2]

Overall, Petitioner's attorney appropriately focused his
advice on helping Petitioner avoid the 45-year mandatory sentence
that would have been the likely result at trial. He did
successfully help Petitioner avoid that outcome. Also, Petitioner
has not provided anything beyond his unexplained and conclusory
statements to show that he would have gone to trial and faced a
45-year minimum sentence if he had known that the attempted murder
cross reference would result in a 22-year, 4-month sentence. This

---

[2]Petitioner has supplied an affidavit from one of his co-defendants,
Jeffrey Alexander, stating that Alexander would not have testified against him
at trial. Even if true, this would have made little difference at trial. There
were other co-defendants and witnesses that could have provided more than enough
testimony to convict Petitioner.

conclusory statement is also contradicted by his sworn statements during his guilty plea that he understood and accepted that he would receive sentences amounting to between fifteen years and life. He can show neither error by counsel nor prejudice from any lack of advice concerning the application of the attempted murder cross reference. Petitioner's first claim for relief fails.

### Claim Two

Petitioner's second claim for relief faults counsel for failing to negotiate a conditional plea agreement preserving his right to appeal the issue he now raises in his motion to dismiss. The issue was first raised in a motion to dismiss and supporting memorandum filed by his attorney early in the criminal case. (Docket Nos. 27, 28.) The motion sought dismissal of the first three counts of the indictment. Count One was based on a violation of 18 U.S.C. § 844, the federal arson statute, while Counts Two and Three were based on the use of weapons during the commission of the crime alleged in Count One. The memorandum argued that it was an element of 18 U.S.C. § 844 that the building involved be one "'used in interstate and foreign commerce.'" The motion claimed that the Castle's residence was a single-family residence rented to citizens of North Carolina by another citizen of North Carolina without the use of any real estate or property management company. It then argued that this excluded the residence from being classified as a "building used in interstate and foreign commerce." The motion claimed that applying the federal arson statute to the Castles' residence exceeded the reach of the statute and, alternatively, of

-9-

Congress' power to regulate interstate commerce. The motion sought dismissal of Counts One, Two, and Three based on the alleged lack of jurisdiction.

There are multiple fatal problems with Petitioner's current ineffective assistance of counsel claim. The first problem for Petitioner is that he was present when his attorney withdrew the motion in open court in the middle of the plea hearing. Petitioner then elected to proceed with the hearing anyway. The issue with the motion to dismiss arose during Petitioner's plea hearing when the government sought to introduce the factual basis supporting Petitioner's plea. Petitioner's attorney stated that they agreed that the Castles' residence was rental property, but did not agree that there was a sufficient connection to interstate commerce. He asked that the presiding judge rule on the pending motion to dismiss in order to preserve the question for appeal. (Docket No. 91 at 11.)

The attending prosecutor stated that the plea agreement as entered would not allow for this and that the issue could only be preserved if it was set out in the agreement. The presiding judge then stated that he would not accept the plea at that time if Petitioner would not admit to the elements of the offense. (Id. at 12.) Petitioner and his attorney discussed the matter privately off the record. When they finished, counsel stated that, "I've spoken with Mr. Zacarolo. We've discussed that issue at length and he agrees with the factual basis, including the jurisdiction element." (Id.) He also noted that this was not the first time

-10-

they had discussed the issue. After further questioning from the
sentencing judge, counsel stated that he and Petitioner did not
want a ruling on the motion to dismiss if it meant that the plea
agreement would not be available. The judge stated that it would
be up to the government to decide that, but that he would only
accept the plea at that time if it contained no reservations and
admitted all elements. After further discussion between counsel
and Petitioner, counsel stated that Petitioner wished to proceed.
He then withdrew the motion to dismiss. (Id. at 13) Petitioner
never protested or disagreed. Therefore, he was fully aware that
the motion was withdrawn and he obviously agreed to the withdrawal
at that time.

Petitioner attempts to avoid this difficulty by claiming that
counsel failed to negotiate a conditional plea that would have
preserved the issue for appeal and that counsel did not properly
advise him as to what he was waiving by accepting the plea
agreement as it was. He claims that counsel did not tell him that
he would have a viable defense under Jones v. United States, 529
U.S. 848 (2000).

Petitioner's first contention is speculative and conclusory.
There is nothing to suggest that, even had counsel sought to
negotiate a conditional plea preserving the right to have the
jurisdictional issue heard in the trial court and on appeal, the
government would have agreed. Moreover, even if such a plea could
have been negotiated, Petitioner can only have been prejudiced by
the failure to negotiate the conditional plea if the right

-11-

preserved was a valuable one, i.e., his jurisdictional argument had some merit. Therefore, an examination of the merits of his jurisdictional claim is necessary. Such an analysis will address Petitioner's second argument that counsel did not advise him that he was waiving a viable defense, as well as cover the arguments made in his current motion to dismiss.

The line of reasoning set out in the original motion to dismiss (docket no. 27) and in the current motion to dismiss (docket no. 118) is fairly straightforward. As stated previously, they contend that, because the Castles' residence was a single-family residence rented to citizens of North Carolina by another citizen of North Carolina without the use of any real estate or property management company, it was not used in interstate commerce and, therefore, was not a building subject to Congress' power to regulate interstate commerce. This argument is based primarily on three cases, two from the United States Supreme Court and one from the Seventh Circuit.

The first case is Russell v. United States, 471 U.S. 858 (1985). In Russell, the owner of a two-unit apartment building attempted to burn the building at a time when it was being rented. The Supreme Court held that, because the building was being rented at the time of the crime, it was being used in interstate commerce within the meaning of the federal arson statute. Id. at 861. Five years later, in Jones, supra, the Supreme Court addressed a situation where a property owner burned the residence that he occupied. The Supreme Court noted that 18 U.S.C. § 844(i) contains

-12-

the words "used in."  It stated that this placed the proper inquiry onto the function of the building and whether that function affects interstate commerce.  The Court rejected consideration of such non-use factors as the receiving of natural gas, a mortgage, or an insurance policy because these items, while perhaps interstate and commercial, were not the function or use of the building.  It held that while the renting of a building was "'unquestionably'" an interstate commercial activity, simply living in a building as a residence was not a "use" that affected interstate commerce. Jones, 529 U.S. at 856.

    The Seventh Circuit case relied upon by Petitioner is United States v. Veysey, 334 F.3d 600 (7th Cir. 2003).  In that case, the residence burned was one that was rented to tenants by "a typical householder, who after living in the house for several years had moved to another state and after trying unsuccessfully to sell the house decided to rent it."  Id. at 603.  Therefore, the owner of the house was not in the rental business per se, but was merely renting because he could not sell.

    Petitioner keys on language in Veysey stating that the case lay somewhere in between Russell and Jones.  He argues in his brief supporting his motion to dismiss that this means that there is a "gap" between those two cases and that the present case falls into that gap.  Although acknowledging that the Seventh Circuit ultimately found interstate commercial use in Veysey, Petitioner attempts to distinguish the present case so that it falls more on the Jones side of the "gap" by noting that the landlord and renters

-13-

in this case live in the same state and that the landlord does not use any type of rental agent to handle the property.

The difficulty for Petitioner, and the reason that all of his arguments on this point fail, is that, whatever distance there may be between <u>Russell</u> and <u>Jones</u>, there is not distance on one critical point: rental property is property used in commerce under the federal arson statute. This was stated in <u>Russell</u> and reiterated in <u>Jones</u>. In fact, <u>Jones</u> is particularly instructive because it rejected the government's attempts to move the focus of the determination away from a building's use and toward other commercial ties such as mortgages, insurance, and natural gas. The Supreme Court rejected these factors because they were not the building's "use." For the same reason, such factors as the state of the landlord's residence and the use or lack of use of a rental agent are also irrelevant. All that matters is "use," and the rental of the property is a "use" "in interstate or foreign commerce" under § 844(i).[3] That was the rule in <u>Russell</u> and in <u>Veysey</u>. Nothing in <u>Jones</u> calls that principle into question. This has also been the conclusion of the Fourth Circuit in a case involving the rental of a single-family residence. <u>United States v. Parsons</u>, 993 F.2d 38, 40 (4th Cir. 1993)(<u>Russell</u> holds that rental of property is per se a use affecting interstate commerce.)

---

[3]As such, it also falls within the power of Congress to regulate interstate commerce. This defeats Petitioner's alternative argument.

In short, the arguments raised in both Petitioner's original and current motions to dismiss are without merit. Binding Supreme Court and Fourth Circuit case law are clearly against him. For this reason, Petitioner's attorney did not err in failing to pursue a conditional plea and Petitioner was not prejudiced by that failure. Likewise, the attorney did not err or prejudice Petitioner by not advising him that he had a winning defense based on the motion to dismiss. He did not have a winning defense. The second claim for relief in Petitioner's § 2255 motion should be denied. Also, Petitioner's current motion to dismiss should be denied on the merits.

### Claim Three

Petitioner's third claim for relief asserts that counsel provided ineffective assistance of counsel by failing to object to sentencing enhancements applied under USSG §§ 2K2.1(b)(1)(A), 2K2.1(b)(5)(B), and 2K2.1(b)(5). As Respondent points out, none of these enhancements affected Petitioner's eventual sentence. Although the PSR did note that all of these enhancements applied in determining a sentence under USSG § 2K2.1, it also noted that the use of the enhancements only resulted in an offense level of 26. The cross reference in § 2K2.1(c)(1) states that if the firearms involved in the crime were used to commit another offense, § 2X1.1 should be used if it will produce a higher offense level. Here, the probation officer determined that, under § 2X1.1(a), the attempted murder guideline in § 2A2.1 would apply and produce an offense level of 33. Because this was a higher offense level, it

-15-

was used as Petitioner's adjusted offense level. (PSR ¶ 18.) The other enhancements then became irrelevant to Petitioner's sentence. Only the attempted murder guideline that was applied through the cross reference mattered. Petitioner cannot show that his attorney improperly failed to object to the irrelevant enhancements or that he was possibly prejudiced unless he can first show that the attempted murder guideline should not have been used. As will be discussed next, he cannot make that showing. His third claim for relief should be denied.

## Claim Four

Petitioner's final claim for relief is that counsel was ineffective because he did not file a proper objection to use of the attempted murder cross reference in USSG § 2A2.1. Counsel did file an objection based on certain legal points and on an alleged lack of evidence to support the application of the attempted murder guideline. (Docket No. 80.) This objection simply failed. (Docket No. 93 at 2-4.) Petitioner claims that counsel should have instead filed an objection claiming that it was not proper to apply the cross reference based on language found in commentary note 4 of USSG § 2K2.4.

In determining Petitioner's offense level under the USSG, the probation officer preparing the PSR grouped his convictions for arson under Count One and possession of destructive devices under Count Four. The conviction under § 924(c) was treated separately because it carried a mandatory consecutive statutory sentence. (PSR ¶¶ 16, 17.) The proper guideline for Count One was determined

-16-

to be USSG § 2K1.4, while the guideline for Count Four was § 2K2.1. Because § 2K2.1 produced the higher offense level, it was ultimately used. However, that made no real difference because both guidelines contained cross reference provisions that caused the guideline for attempted murder to apply. The cross reference used was found in § 2K2.1(c)(1)(A) which requires that, if the firearm possessed was used in conjunction with another crime or attempted crime, guideline § 2X1.1 should be used if it results in a higher overall offense level. Using § 2X1.1, the probation officer determined that § 2A1.2 (Assault with Intent to Commit Murder; Attempted Murder) would apply. It was then used because it resulted in an offense level of 33, which was higher than the level under § 2K2.1. (Id. ¶ 18.)

Section § 2K2.4 of the Guidelines addresses situations where a firearm or explosive is used in the commission of certain other crimes. It states that, where a defendant is convicted under 18 U.S.C. § 924(c), the sentence for that count is to be the mandatory minimum sentence under the statute. Application note 4 in the commentary under that guideline covers situations where a defendant is convicted of both a § 924(c) charge and another charge involving the same weapon. That application note states that, in determining the sentence for the other offense, specific offense characteristics for possessing, brandishing, using, or discharging the explosive or firearm should not be applied because those actions are already taken into account by the § 924(c) conviction and sentence. It specifically lists the enhancements in

-17-

§§ 2K1.3(b)(3) and 2K2.1(b)(5) as enhancements that should not apply and states that no enhancements based on § 1B1.3 (Relevant Conduct) should apply. Petitioner's argument against the cross reference is that, even though the cross reference in § 2K2.1(c)(1) is not specifically mentioned in the application note, it should not have been applied in his case because the conduct evaluated in applying the cross reference is relevant conduct under § 1B1.3.

Petitioner supports his relevant conduct argument by citing to the case of United States v. Williams, 431 F.3d 767 (11th Cir. 2005). However, this case does not carry the day for Petitioner. It does not, as he claims, establish that cross referenced conduct and relevant conduct are synonymous. Instead, it only establishes the limits on what can be included as relevant conduct under § 1B1.3 as also being the limits on conduct that can be considered in applying a cross reference. Id. at 771-72(noting circuit split on this point and joining circuits that limit cross references to actions that could be included as relevant conduct). It does not, as Petitioner claims, establish that a cross reference is an enhancement based on specific offense characteristics that falls within application note 4 of § 2K2.4. Put another way, the decision provides an established and familiar definition for conduct that can be considered in applying a cross reference, but does not address the issue present in this case of whether or not a cross reference should be applied in the first place.

As Respondent points out, the answer to that question is best found in United States v. Palmer, 62 Fed. Appx. 489 (4th Cir.

-18-

2003). There, a defendant was arrested for two sales of crack cocaine to an informant. While on his way to make a third sale, he was arrested with a loaded handgun in his car. Charged with three counts of drug trafficking, one count of possession of a firearm by a convicted felon in violation of 18 U.S.C. § 922(g)(1) and one count under § 924(c), he pled guilty to the two firearms counts. The defendant was then sentenced to 70 months for the § 922(g) conviction and a consecutive 60 months for the § 924(c) conviction. The 70-month sentence was calculated using the cross reference under USSG § 2K2.1(c)(1)(A). This resulted in the defendant's sentence being calculated and increased using his drug dealing conduct. The defendant objected on the basis that the application notes to § 2K2.4[4] prevented the use of the cross reference. The Fourth Circuit rejected the argument, noting that the Sentencing Commission could have, but did not, include the cross reference guideline along with the list of prohibited enhancements. This reasoning would apply to the case currently before this Court as well.

Petitioner attempts to avoid this result by arguing that Palmer is different from his case because the cross reference here was based on relevant conduct, while the cross reference in Palmer was not. This does not appear to be correct, as the drug dealing in Palmer easily falls within the definition of relevant conduct set out in USSG § 1B1.3(A)(1). More importantly, it does not

---

[4]What is now application note 4 was labeled as application note 2 at that time.

matter.  Application note 4 to USSG § 2K2.4 prohibits sentencing a defendant using certain **enhancements** based on specific offense characteristics.  The cross reference is not an **enhancement** of any type.

> "'A cross reference (an instruction to apply another offense guideline) refers to the entire offense guideline (i.e., the base offense level, specific offense characteristics, cross references and special instructions).'" U.S.S.G. § 1B1.5(a). Application of the cross reference or the determination of the appropriate offense guideline based on the relevant conduct inquiry does not "'increase'" a defendant's offense level. It merely sentences him under the offense guideline which reflects the full scope of his conduct."

United States v. Beith, 407 F.3d 881, 889 (7th Cir. 2005). Therefore, a cross reference is not an enhancement.  It is the application of an entirely new guideline to calculate an adjusted offense level.  Because the cross reference applied here was not an enhancement, it cannot be affected by the application note. Counsel did not err in failing to make the objection proposed by Petitioner, and Petitioner was not prejudiced by the failure to raise the meritless objection.  His fourth claim for relief should be denied.

**IT IS THEREFORE ORDERED** that Petitioner's motion to amend his reply brief (docket no. 136) is granted.

-20-

**IT IS RECOMMENDED** that Petitioner's motion to dismiss (docket no. 118) and Petitioner's motion to vacate, set aside, or correct sentence (docket no. 119) be **DENIED** and that Judgment be entered dismissing this action.

_____/s/ Donald P. Dietrich_____
**Donald P. Dietrich**
**United States Magistrate Judge**

September 24, 2009